IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Victor Chavarria, | ) | No. CV 06-221-TUC-FRZ (HCE) |
| | ) | |
| Plaintiff, | ) | **REPORT & RECOMMENDATION** |
| | ) | |
| vs. | ) | |
| | ) | |
| | ) | |
| Michael J. Astrue,[1] Commissioner of | ) | |
| Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

On May 4, 2006, Plaintiff filed the instant action seeking review of the final decision of the Commissioner of Social Security pursuant to 42 U.S.C. § 405(g). On that same date, Plaintiff's case was referred to the undersigned Magistrate Judge for a Report & Recommendation pursuant to the Rules of Practice of this Court.

Pending before the Court are Plaintiff's Motion for Summary Judgment (hereinafter "Plaintiff's MSJ") and Defendant's Cross-Motion for Summary Judgment (hereinafter "Defendant's XMSJ"). For the following reasons, the Magistrate Judge recommends that the District Court grant in part and deny in part Plaintiff's MSJ, deny Defendant's XMSJ, and remand this matter for further proceedings.

---

[1]On February 12, 2007, Michael J. Astrue was sworn in as the Commissioner of Social Security. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Michael J. Astrue is substituted as the defendant in this action.

I.      PROCEDURAL HISTORY

On February 24, 2004, Plaintiff submitted to the Social Security Administration (hereinafter "SSA") an application for disability insurance benefits alleging inability to work since March 1, 2001 due to problems with his back, shoulder, arm, feet, vision, and intestines, chest pain, constant migraines, and numbness in his hands and feet.[2] (TR. 72-74, 82)  Plaintiff's application was denied initially and on reconsideration. (TR. 38, 44)

Plaintiff then requested a hearing before an administrative law judge (hereinafter "ALJ") and the matter was heard on May 4, 2005 by ALJ Lauren R. Mathon.  (TR. 382) At the hearing, the ALJ heard testimony from medical expert Irvin Belzer, M.D., vocational expert Stacia Schonbrun, and Plaintiff who was represented by counsel. (TR. 382-427)  On November 18, 2005, the ALJ entered a decision that Plaintiff was not disabled as defined in the Social Security Act. (TR. 14-23)

Plaintiff requested that the Appeals Council review the ALJ's decision.  (TR. 10) The Appeals Council denied Plaintiff's request for review thereby rendering the ALJ's November 18, 2005 decision the final decision of the Commissioner.  (TR. 6)  Plaintiff then initiated the instant action.

II.     THE RECORD ON APPEAL

        A.      Plaintiff's general background and Plaintiff's statements in the record

Plaintiff was born on July 28, 1957.  (TR. 400)  Plaintiff is not married, has no children, and lives with his mother and sister.  (TR. 400) He completed school through the eighth grade[3] and thereafter began working "in the concrete area", i.e. masonry.  (Id.)

Plaintiff can speak English.  (TR. 401) He can read "[a] little" such as a simple letter or a few paragraphs.  (Id.; *see also* TR. 81 (Plaintiff indicated that he reads English at a sixth-

---

[2]The record indicates that Plaintiff's application was "filed effective February 6, 2004."  (TR. 23)

[3]Plaintiff testified that "they tried to put me in special [education]...I went for two days and they pushed me back..."  (TR. 404)

grade level))  He can write his name and address but cannot write a shopping list or fill out reports.  (TR. 401-402; *see also* TR. 81)  He does not spell well and his sister helped him complete the forms required for his disability claim.  (TR. 403)   Plaintiff is unable to add, subtract, multiply or divide figures.  (TR. 403-404)

Plaintiff worked as a mason until 2001 when he began to experience bladder infections.  (TR. 404-405) Masonry was heavy work frequently requiring Plaintiff to lift over 50 pounds.  (TR. 405) He also worked as a part-time janitor in 2000.  (TR. 83, 427)

Plaintiff experiences constant chest pain from his neck to six inches down his chest and shooting to his back.  (TR. 406-407) His pain is aggravated by becoming angry, walking a lot, bending, lifting, kneeling, and stooping. (TR. 408) He lies down and takes medication for relief.  (Id.)

Plaintiff's hands are weak and fall asleep which causes him to drop things like cups of coffee and to switch hands while brushing his teeth.  (TR. 408, 410)  Plaintiff was scheduled to undergo surgery for carpel tunnel syndrome the day following the hearing. (TR. 394, 409) At the hearing, he wore braces on his hands for that ailment.  (TR. 409-410)

Plaintiff sees a spot in his left eye which makes it difficult to drive at night and causes problems focusing.  (TR. 411) He experiences migraines three times a day for which he takes aspirin.  (TR. 415, 424) He has never sought medical treatment for his migraines.  (TR. 424)

Plaintiff also experiences constant back and neck pain.  (TR. 411)  Sitting, standing, walking, stooping, crawling, and bending aggravate Plaintiff's back pain.  (TR. 412)

Plaintiff suffers from depression.  (TR. 414) He rarely leaves his home, spends a typical day in his room, and becomes nervous around people.  (Id.)   He initially did not attend group therapy because he did not like being with a lot of people, but shortly before the hearing he began attending group therapy.  (TR. 420, 425) He takes medication which makes him calmer.  (TR. 414, 420).

Plaintiff's medications make him drowsy and dizzy.  (TR. 415) He has problems sleeping.  (Id.)  Plaintiff's mother and sister clean the house and make meals.  (TR. 416)

Plaintiff does not think there is any job he is capable of working.  (TR. 417)

In 2001 through the first half of 2002,  no doctor restricted Plaintiff's ability to work. (TR. 417-418) In 2003, Plaintiff was restricted from heavy lifting.  (TR. 418)  At some point a doctor told Plaintiff to stay out of the sun.  (TR. 418-419) Although Plaintiff experienced problems with his eyes and hands, he did not discuss those problems with doctors prior to 2003.  (TR. 419) Plaintiff later explained that he told the doctor about his hands but the doctor wanted to focus on Plaintiff's back pain.  (TR. 424-425)

On a typical day, Plaintiff rises at 10:00 a.m., fixes himself cereal, walks around the house, sits outside, and  watches television.  (TR. 423; *see also* TR. 109-110)

B.     Vocational Expert Testimony

Vocational expert Stacia Schonbrun testified at the hearing before the ALJ that Plaintiff's past work as a construction mason and laborer was heavy, unskilled work. (TR. 426) His past work as a janitor in 2000 was medium, unskilled work.  (Id.)  When the  ALJ asked whether a person of the same age, education and vocational experience as Plaintiff, who can do light level exertional work, can frequently stoop but has no other postural or environmental limitations could perform Plaintiff's past work, Ms. Schonbrun answered, "No." (TR. 428) When the ALJ asked Ms. Schonbrun whether there were jobs such a person could do, Ms. Schonbrun answered, "Yes."  (Id.)  The ALJ and Ms. Schonbrun declined consideration of some jobs identified by Ms. Schonbrun , such as courier and security guard, because the jobs required "some writing."  (TR. 428-429) Ultimately, Ms. Schonbrun identified the jobs of: housekeeper, *Dictionary of Occupational Titles* (hereinafter "DOT") number 323.687-014 of which 20,130 jobs are available in Arizona and 912,000 jobs are available nationally; parking lot attendant, DOT number 915.463-010, of which 2,280  jobs are available in Arizona and 108,460 jobs are available nationally, but the number of available jobs would be eroded by 50% because of money handling in light of Plaintiff's poor math skills; and assembly, DOT number 729.384-010, of which 19,170 jobs are available in

Arizona and 1.1 million jobs are available nationally, but the number of available jobs would be eroded by 50% "for the writing." (TR. 439-430).

The same jobs would be available for a person similar to Plaintiff together with the restrictions identified by treating Dr. Gonzalez in April 2004. (TR. 430; *see also* TR. 256-257)

Restrictions to avoid wearing heavy chest garments, to avoid jerking motions of the head, and to avoid repetitive hand movements would eliminate housekeeping and assembly jobs. (TR. 431-432) Because working as a parking lot attendant would require only occasional repetitive use of the hands, that job would remain possible for Plaintiff. (TR. 432) Additionally, a person similar to Plaintiff with the same limitations could also work as a restaurant host, DOT number 310.137-010, of which 5,520 jobs are available in Arizona,[4] and 295,170 jobs are available nationally, but that amount would be eroded by 50% to eliminate jobs that require "more excessive writing." (TR. 432-433)

C.     Lay Testimony

The record contains statements from Plaintiff's brother and sister indicating that Plaintiff spends most of his time in his room, cries, has a short attention span, cannot hold his comb well enough to comb his hair, cannot follow instructions, and has difficulty when counting money. (TR. 163-180) Plaintiff is unable to lift, squat, bend, stand, reach, walk, sit, kneel, talk, see, climb stairs, use his hands, concentrate, understand, follow instructions, and has memory problems. (TR. 168, 177) Plaintiff's sister stated that her "brother is illiterate. Other than construction work, he never learned how to do any other kind of work. Now with his painful condition he is unable to do much of nothing." (TR. 179) Plaintiff's brother stated that Plaintiff "cannot write and read well." (TR. 166)

---

[4]The transcript reads: "the gross number, 5,520, nationally 295,170." (TR. 432) Thus, that 5,520 refers to jobs in Arizona is not stated; however, the context of Ms. Schonbrun's testimony supports the conclusion that she is referring to Arizona.

D.     Medical Evidence

1.     Plaintiff's Treating Physicians

a.     Abdominal and Urinary Issues

In June 2001, Eric Kendle, M.D., noted that Plaintiff was recovering from a recent colon resection with Hartmann's pouch for complicated diverticulitis and was doing well. (TR. 203)

On December 18, 2001, Plaintiff was seen by H. Thomas Sethney, M.D., upon referral from Jay Park M.D., for microscopic hematuria.  (TR. 212) A cytoscopic examination showed a bladder tumor.  (Id.; *see also* TR. 215-216)  Despite Dr. Sethney's suspicion that Plaintiff's tumor was an adenocarcinoma, a biopsy was consistent with an inflammatory mass and granulation tissue.  (TR. 211) A subsequent CT scan showed "a persistent but benign process such as a diverticular abscess."  (TR. 222)

On March 7, 2002, Plaintiff returned to Dr. Sethney complaining of urgency and frequency in urination.  (TR. 210) Dr. Sethney noted that Plaintiff's condition was "consistent with sigmoid diverticulitis..[m]ost likely this will require surgical repair."  (Id.) He referred Plaintiff for a surgical consultation.  (Id.; *see also* TR. 201, 202, 242 (all regarding surgical consultation by Dr. Kendle.))

On May 24, 2002, Plaintiff underwent surgery, performed by Dr. Kendle, involving abdominal exploration with takedown of colovesical fistula, segmental sigmoid colon resection,  with end colostomy and Hartmann's pouch.  (TR. 239-241) Dr. Kendle's June, July, and August 2002 followup notes denoted that Plaintiff was doing well.  (TR. 198-200)

On October 7, 2002, Plaintiff underwent surgery for a colostomy takedown and reanastomosis. (TR. 204) Dr. Kendle's October and November 2002 follow up notes showed Plaintiff was doing well.[5]  (TR. 194-195)

---

[5]In March 2004, Dr. Kendle returned a Medical Source Statement of Ability To Do Work-Related Activities (Physical) regarding Plaintiff.  (TR. 254-255) Dr. Kendle was unable to respond to any of the questions because he had not seen Plaintiff in two years and

On October 22, 2003, Plaintiff presented to Armando Gonzalez, M.D., who diagnosed inflammatory tumor of the bladder and hypertension.  (TR. 369)  He was referred to Dr. Sethney who, after examination and an office cytoscopy on November 20, 2003, diagnosed: past history of diverticular disease with extension to the dome of the bladder; irritative voiding symptoms, resolved after his diverticular disease was treated; microscopic hematuria, urinalysis today noting trace lysed red blood cells.  (Id.; TR. 209)

b.      Neck, Back, Shoulder and Carpel Tunnel Issues

A September 3, 2002 whole body bone scan denoted: no diagnostic scintigraphic abnormalities in the region of the first lumbar vertebra; probable inflammatory changes in the left temporal skull region of the external auditory canal; mild degenerative changes in the right shoulder joint and thoracic spine.  (TR. 206, 374)

On January 26, 2004, Plaintiff saw Dr. Gonzalez with complaints of chronic neck, back and shoulder pain.  (TR. 233)  Dr. Gonzalez opined that the pain is "related to the fact that he works as a mason" and has been doing so since he was 14 years of age.  (Id.)  Examination of the neck, thorax, lumbar area, shoulders and knees revealed mild to moderate pain "at best with obvious D[egenerative] J[oint] D[isease] from overuse."  (Id.)  Dr. Gonzalez prescribed Naproxen and ordered x-rays.  (Id.)  A January 27, 2004 radiology report concerning Plaintiff's cervical, thoracic and lumbar spine, and PA and lateral chest was essentially normal.  (TR. 220; *see also* TR. 231 (Dr. Gonzales stating that "A CT scan that I ordered of the cervical, thoracic and lumbar area does not reveal very much disease."))  "[A] separated osteophyte at the infero-anterior CS vertebral body" and "small amount of plate-like atelectonic along the right lung base" were noted.  (TR. 220)

On March 16, 2004, Plaintiff presented to Dr. Gonzalez with complaints of neck pain, right hand pain involving a nodule along the tendon of his left ring finger, and pain from an

---

had "no way to know" Plaintiff's work limitations or restrictions.  (Id.)

abdominal hernia.  (TR. 231) Dr. Gonzalez referred Plaintiff for evaluation by other doctors. (Id.)

On April 1, 2004, Dr. Gonzalez completed a Medical Source Statement of Ability To Do Work-Related Activities (Physical) wherein he indicated that from March 16, 2004 through March 16, 2005, Plaintiff could: lift up to 20 pounds occasionally, i.e., up to one-third of an 8-hour workday; lift up to 25 pounds frequently,[6] i.e.,from one-third to two-thirds of an 8-hour workday; stand and/or walk and sit about 6 hours in an 8-hour workday with breaks such as lunch hours to alternate between sitting and standing; frequently climb, balance, stoop, kneel, crouch and crawl; and reach, handle, finger, feel, see, hear and speak without limitation.  (TR. 256-257) Dr. Gonzalez' diagnosis was degenerative disc disease. (TR. 257)

On April 14, 2004, Derrik Woodbury, M.D., an orthopedic surgeon examined Plaintiff on referral from Dr. Gonzalez.  (TR. 227-228)  Upon examination, Dr. Woodbury noted tenderness along Plaintiff's thoracolumbar spine and "some tightness over the paracervical soft tissue structures of his neck.  The patient's greatest tenderness would be about T12." (TR. 228)  Dr. Woodbury reviewed Plaintiff's x-rays and noted:

> degenerative change in the patient's cervical spine as separated osteophyte at the inferior anterior aspect of C5.  What is most noticeable to me is what appears to be a bamboo type of thoracic spine.  The lumbar spine as well appears to be calcified along the anterior longitudinal ligament.

(Id.)  Dr. Woodbury prescribed Medrol Dosepak to decrease inflammation in Plaintiff's foraminal outlets, Percocet for breakthrough pain, and physical therapy including cervical traction.  (Id.)

Plaintiff saw Dr. Woodbury for follow up on June 9, 2004 when he reported no improvement.  (TR. 310) Plaintiff did not feel relief from physical therapy, which he attended once, or from the Medrol Dosepak.  (Id.)  Only the pain medication helped.  (Id.)  On

---

[6]Dr. Gonzalez did not explain why Plaintiff could lift only 20 pounds occasionally but could lift a heavier weight of 25 pounds frequently.

examination, Plaintiff's condition was unchanged and he had paracervical soft tissue structure spasm and irritation.  (Id.)  There was no atrophy or dystrophy but Plaintiff appeared uncomfortable to Dr. Woodbury.  (Id.)  Dr. Woodbury prescribed pain medication and ordered an MRI.  (Id.)

On June 15, 2004, Dr. Gonzalez noted that Dr. Woodbury agreed that Plaintiff suffered from arthritis.  (TR. 225) Because Naproxen did not help Plaintiff, Dr. Gonzalez prescribed Celebrex.  (Id.)  Dr. Gonzalez also diagnosed GERD and prescribed Protonix for same.  (Id.)

On July 19, 2004, Dr. Woodbury noted on follow-up that Plaintiff felt "much better with much less neck pain and no radiculopathy."  (TR. 309) The MRI of Plaintiff's cervical spine denoted "some moderate foraminal encroachment at C5-6 and C4-5...this is compatible with the patient's age and normal degenerative findings."  (Id.)  Dr. Woodbury gave instructions "for further conservative care", recommended that Plaintiff sleep with a cervical collar, and prescribed medication for breakthrough pain.  (Id.)

On January 26, 2005, FNP-C Shannon Sealey, who worked with Dr. Gonzalez, assessed "Dupuytren's contracture, right palm, with noticeable weakness in his grip."  (TR. 357) Plaintiff was referred to hand surgeon, Armando J. Alfaro, M.D., whom he saw in February 2005.  (Id.; TR. 353) Plaintiff reported a mass on his palm he noticed five months previously, numbness in both hands involving the fingers and median nerve distribution, nocturnal pain, and decreased strength.  (TR. 353) Upon examination, Dr. Alfaro's impression was carpal tunnel bilateral and Dupuytren's involving his right hand.  (Id.)  He recommended nerve conduction studies and splints.  (Id.)  Results from nerve conduction studies were consistent with mild bilateral carpal tunnel syndrome.  (TR. 351; Plaintiff's Statement of Facts (hereinafter "PSOF"), p.5)

On April 24, 2005, Dr. Gonzalez completed a Medical Assessment of Ability to Do Work-Related Activities (Physical) wherein he indicated that Plaintiff: could not lift more than ten pounds; could stand/walk 4 hours in an 8-hour workday and without interruption for

one hour at a time due to chronic cervical and low back pain; could sit a total of 6 to 8 hours in an 8-hour work day and without interruption for two to three hours due to chronic cervical and low back pain; could frequently stoop and kneel, occasionally climb, crouch, and never balance or crawl; could not reach due to cervical and lower back pain; and could not work around dust, noise, fumes and humidity.  (TR. 330-331)

In March 2005, Plaintiff began physical therapy for neck and back pain.  (TR. 322) Physical therapy notes continue through April 2005.  (TR. 320-335, 333-342)

c.      Chest Pain

On September 24, 2004, Plaintiff saw David Lapan, M.D., on referral from Dr. Gonzalez for complaints of chest pain.[7]  (TR. 365) His pain "is very atypical and does not sound cardiac..."  (Id.)   Nor were his symptoms typical of angina.  (Id.)  Dr. Lapan was concerned regarding Plaintiff's EKG, exaggerated heart rate and prolonged recovery time and "I am just not convinced there is not vascular disease going on here....His symptoms, although vague, are concerning, particularly with his family history...."  (Id.)  On October 15, 2004, Dr. Lapan reported that a vascular study showed no peripheral vascular disease and an "echo" was normal.  (TR. 362) Although Dr. Lapan was "fairly convinced this is non-cardiac...I do not feel comfortable enough just to dismiss him" because of family medical history.  (Id.)  A subsequent nuclear test was negative.  (TR. 360) Plaintiff's stress treadmill test was normal.  (TR. 361)

On November 8, 2004, Dr. Lapan opined that Plaintiff's chest pain was not of a cardiac nature.  (TR. 360) On December 8, 2004, Dr. Lapan ordered an angiography. (TR. 358)

---

[7]Defendant's Statement of Facts (hereinafter "DSOF" at p.2, ¶8) indicates that the September 24, 2004 record is by Dr. Gonzalez, however it is a letter from Dr. Lapan to Dr. Gonzalez.  (TR. 365)

On December 15, 2004, Dr. Gonzalez noted that Plaintiff had a cardiac catheterization which denoted that Plaintiff did not have "any lesion that is of concern and thus, perhaps the pain that he had been complaining about is no more and no less than GERD."  (TR. 359)

On December 22, 2004, Dr. Lapan noted that Plaintiff was still having chest pain but "[h]is coronaries were normal and the pain I am sure is musculoskeletal at this point."  (TR. 358) He recommended Tylenol or Aleve for pain.  (Id.)

On January 26, 2005, FNP-C Sealey noted Plaintiff's complaint of right chest pain and that angina had been ruled out with a normal angiogram.  (TR. 357) She ordered a chest x-ray because she detected decreased breath sounds on the right.  (Id.)  Plaintiff was referred to Dr. Lapan.  (Id.)  A January 27, 2005 chest x-ray denoted no active cardiopulmonary disease. (TR. 356)

On February 2, 2005, Dr. Lapan noted Plaintiff's continued complaints of chest pain: "[i]t is just annoying and a little uncomfortable for him...it is there most of the time. Sometimes it is sharp and sometimes it is dull. Sometimes it shoots through the back."  (TR. 355) Dr. Lapan thought Plaintiff's condition was musculoskeletal, not gastrointestinal.  (Id.) He prescribed 600 mg of Ibuprofen.  (Id.)

On February 21, 2005, FNP-C Sealey assessed Plaintiff with chronic GERD and ordered an endoscopy "since he is having continued chest pain which is noncardiac with a previous normal angiogram.  The pain is radiating through to his thoracic back which still could be related to significant degenerative joint disease."  (TR. 354) She also referred Plaintiff to Dr. Woodbury "for further management" of degenerative joint disease.  (Id.) Plaintiff also continued on AcipHex for GERD.  (Id.)

On March 2, 2005, Plaintiff told Dr. Lapan the Ibuprofen did not help and he still felt pain.  (TR. 352) Cardiac exam was normal.  (Id.)  Dr. Lapan opined the pain was musculoskeletal.  (Id.)  Dr. Lapan  discontinued the Ibuprofen and prescribed Medrol Dosepak.  (Id.)

On March 14, 2005, Plaintiff saw Dr. Gonzalez with continued complaints of chest pain. (TR. 347) Dr. Gonzalez noted that Dr. Lapan was "a little baffled by the complaints..." and "thinks that perhaps the pain...is related to GERD." (Id.) Dr. Gonzalez diagnosed chest wall pain, chronic cervical and thoracic spine pain, GERD, and hiatal hernia. (Id.)

An April 2005 esophagogastroduodenoscopy was unremarkable. (TR. 345-346, 344) Dr. Lapan concluded that Plaintiff's symptoms were "probably musculoskeletal" and prescribed Imdur. (TR. 344) A few weeks later, Dr. Lapan switched Plaintiff to an anti-inflammatory because the Imdur did not help. (TR. 343) In May 2005, Dr. Lapan prescribed trigger point injections to Plaintiff's sternum. (TR. 181)

d.    Mental/Cognitive Issues

In June 2004, Plaintiff was assessed at SAMHC regarding complaints of depression. (TR. 269-286) He reported experiencing depression since his surgery two years previous. (TR. 269) He had decreased energy, restless sleep, frequent headaches and confusion. (TR. 282) His mood was depressed, his affect blunted, his speech "normally responsive, his thought process "logical, relevant", his thought content "appropriate", he was oriented, his memory was intact, his intellectual capacity was "average", and judgment, impulse control, and insight were "good". (TR. 280-281) Diagnosis was Depressive Disorder NOS, mood disorder due to chronic pain with depressive features. (TR. 283) Plaintiff's Global Assessment of Functioning (hereinafter "GAF score") was 60: "moderate symptoms." (TR. 284) He was referred for crisis counseling. (TR. 267)

On September 14, 2004, Plaintiff presented to FNP-C Sealey complaining of forgetfulness, dysarthria, and chest pain. (TR. 367) Further testing including an MRI of Plaintiff's brain was ordered. (Id.) FNP-C Sealey's notes from September 21, 2004 reflected "[m]ini-mental status exam score 21/30. However, he did only finish the sixth grade." (Id.) She also noted that Plaintiff's complaints of cognitive impairment could possibly be related to an early-age head trauma in light Plaintiff's earlier report of head trauma secondary to a motor vehicle accident when he was in his twenties. (Id.; TR. 367) On October 5, 2004,

- 12 -

FNP-C Sealey reported that Plaintiff's MRI was normal.  (TR. 364) "[B]ecause he has
several obvious areas of cognitive impairment, will send him to a neurologist for further
evaluation and management.  We may need to consider putting him on...Aricept or Namenda.
(Id.)

On December 15, 2004, Dr. Gonzalez noted that Dr. Valdivia, the doctor to whom
Plaintiff was referred for "a possible dementia workup" found that Plaintiff "is more
depressed than anything else..."  (TR. 359) Plaintiff reported to Dr. Gonzalez that he was
depressed about being unable to work and about his life in general.  (Id.)  He had difficulty
falling asleep and woke in the middle of the night worrying.  (Id.)  Dr. Gonzalez prescribed
Lexapro.  (Id.)

On January 26, 2005, FNP-C Sealey noted that Plaintiff's depression was better with
Lexapro.  (TR. 357) By February 21, 2005, Plaintiff had switched to Prozac because his
insurance would not cover Lexapro.  (TR. 354) "He was doing better on Lexapro....He is
doing fair on" Prozac.  (Id.)  FNP-C Sealey increased Plaintiff's dosage of Prozac.  (Id.)

On May 4, 2006, Elen McVay, RN, MS, ANP-C, completed a Medical Assessment
of Ability To Do Work- Related Activities (Mental) wherein she indicated that since
"probably 2000", Plaintiff suffered from profound depression resulting in "energy,
amotivation, insomnia, hopelessness, guilty fatigue, listlessness, thoughts [and] dreams of
death (no suicidal plan or intent)."  (TR. 5-B-5-D) She further indicated that Plaintiff had a
good ability to follow "verbal [and] short" work rules and use judgment; he had a fair ability
to relate to co-workers and interact with a supervisor; and poor or no ability to deal with
public, deal with work stresses, or maintain attention/concentration.  (TR. 5-B) His ability
to understand, remember, and carry out complex job functions was poor.  (TR. 5-C)  His
ability to remember and carry out detailed but not complex job instructions or even simple
instructions was fair.  (Id.)  He had a good ability to maintain personal appearance and relate
predictably in social situations.  (Id.)  He was fair at behaving in an emotionally stable
manner ("isolative, very quiet") and demonstrating reliability.  (Id.)  Plaintiff's level of

- 13 -

impairment would be affected by the following work related stressors: unruly or demanding customers, production demands or quotas, demand for precision, need to make quick and accurate independent decisions in problem solving on a consistent basis, need to make accurate independent decisions in problem solving on a consistent basis,  and routine, repetitive, simple, entry level jobs would exacerbate instead of mitigate psychological symptoms in the workplace.  (Id.)  Plaintiff's depression made him unable to concentrate. (Id.)  Nurse McVay noted that Plaintiff was "too depressed to function in the workplace." (Id.)  She also stated that Plaintiff would be expected to miss work more than three to four times per month due to his impairments and that his disability had lasted 12 months continuously or can be expected to last 12 months continuously.  (TR. 5-D)  Nurse McVay also noted that Plaintiff first sought treatment at La Frontera on July 18, 2005.  (Id.)

### e.  Vision Issues

On October 14, 2004, Plaintiff was examined by Henry Hudson, M.D., of the Retina Centers, P.C., on referral from Dr. Cotner who had diagnosed macular edema.  (TR. 316) Plaintiff complained of a dark spot in the center of the vision of his left eye for the last four months.   (Id.)   Dr. Hudson's diagnosis was central serous retinopathy and a serous detachment  of the macula in the left eye.  (Id.)  He noted that "this condition tends to improve on its own" and recommended further testing "to document the leak point in case laser therapy is needed."  (Id.; *see also* TR 314 (As of October 21, 2004, Dr. Hudson's preference was "to observe him for spontaneous resolution.  Laser therapy may be indicated in the future, but this might leave the eye with a paracentral scotoma."))

### 2.       State-Agency Physicians (non-examining)

In April or May 2004,[8] A. Hirsch, M.D., completed a Residual Functional Capacity Assessment form wherein he indicated that Plaintiff: could lift up to 20 pounds occasionally

---

[8]The exact month is illegible.

and up to 25 pounds frequently;[9] could stand and or walk with normal breaks for 6 hours in an 8-hour work day; could sit with normal breaks for 6 hours in an 8-hour work day; was not limited in pushing or pulling; and had no postural, manipulative, visual or environmental limitations (TR. 258-264)

In August 2004, a doctor whose name is illegible, completed a Residual Functional Capacity Assessment form indicating that Plaintiff could lift up to 20 pounds occasionally and up to 10 pounds frequently; could stand and or walk with normal breaks for 6 hours in an 8-hour work day; could sit with normal breaks for 6 hours in an 8-hour work day; should only stoop frequently because of a stiff neck but had no other postural limitations; was not limited in pushing or pulling; had no manipulative, visual or environmental limitations (TR. 301-308)

Also in August 2004, psychologist Paul Tangeman, Ph.D., completed a Psychiatric Review Technique form wherein he diagnosed affective disorder, depression NOS and indicated that Plaintiff's impairment was not severe.  (TR. 287) He further indicated that Plaintiff was mildly restricted in activities of daily living, maintaining social functioning, and maintaining concentration, persistence or pace.  (TR. 297) Dr. Tangeman cited Plaintiff's June 2004 evaluation at SAMHC showing "intact memory and average cognition."  (TR. 299)

At the May 2005 hearing before the ALJ, Irvin Belzer, M.D., who is board certified in internal medicine, testified as a medical expert.  (TR. 388-389) Dr. Belzer, testified that Plaintiff's ongoing medical problems at the time of the hearing were osteoarthritis of his cervical spine, anterior chest pain "of undetermined origin", depression, and carpal tunnel syndrome.  (TR. 389-390) Dr. Belzer also testified that Plaintiff's arthritis and carpal tunnel

---

[9]Dr. Hirsch's weight restrictions are the same as those noted by Dr. Gonzalez in his April 1, 2004 assessment.  (*See* TR. 256) Like Dr. Gonzalez, Dr. Hirsch does not explain why Plaintiff could lift only 20 pounds occasionally but could lift a heavier weight of 25 pounds frequently.

syndrome are mild.  (TR. 390) He opined that Plaintiff's arthritis would not require any work restrictions.  (Id.) Since February 2005, Plaintiff's bilateral carpel tunnel condition would prevent Plaintiff from performing repetitive work with his hands such as typing, working with a hammer or jack hammer most of the day, or performing other movements "[w]here the hands were constantly going back and forth."  (TR. 390-391) Dr. Belzer testified that Plaintiff's conditions, considered separately or in combination, did not meet or equal a disability listing.  (TR. 390)

Dr. Belzer also testified that in 2002, Plaintiff, who worked as a laborer, would have been prevented from working for three to four months due to suffering a fistula between his colon and his bladder ("colonic vesicular or vesicle fistula") which required a resection of his colon and use of a temporary colostomy.[10]  (TR. 392) According to Dr. Belzer, Plaintiff was not subject to any work restrictions for any continuous period of 12 months or more from March 2001 through February 2005.  (TR. 392-393)

To the extent Dr. Lapan diagnosed Plaintiff with chest pain due to costarchronditis, an arthritis condition between where the ribs and the sternum articulate, Dr. Belzer recommended that Plaintiff avoid "anything that would cause any significant pressure on his chest, for example, having to wear a heavy vest or heavy outer...garments.  If they put pressure on his chest, it would be difficult for him...and...it could trigger the pain.  Then there's difficulty with bending, lifting, et cetera."  (TR. 397)

A blind spot in Plaintiff's eye limits his ability to do work involving "jerky motions of the head" such as using jack hammers or shooting a gun.  (TR. 398) Therefore, Plaintiff should avoid machinery that would cause jolting to the body.  (Id.)

Dr. Belzer noted that the records showed Plaintiff had responded to Lexapro for depression.  (TR. 393) Plaintiff's medication was later changed to Prozac for insurance

_____

[10]Several months after the first surgery, a second surgery was performed to remove the temporary colostomy.  (TR. 394)

purposes and Dr. Belzer "did not see any follow up notes saying that the Prozac was as effective as the Lexapro had been." (Id.)

> E.      The ALJ's Findings

>> 1.      Claim Evaluation

SSA regulations require the ALJ to evaluate disability claims pursuant to a five-step sequential process. 20 CFR §§404.1520, 416.920; *Baxter v. Sullivan,* 923 F.2d 1391, 1395 (9th Cir. 1991). The first step requires a determination of whether the claimant is engaged in substantial gainful activity. 20 CFR §§ 404.1520(b), 416.920(b). If so, then the claimant is not disabled under the Act and benefits are denied. *Id.* If the claimant is not engaged in substantial gainful activity, the ALJ then proceeds to step two which requires a determination of whether the claimant has a medically severe impairment or combination of impairments. 20 CFR §§ 404.1520(c)), 416.920(c)). In making a determination at step two, the ALJ uses medical evidence to consider whether the claimant's impairment more than minimally limited or restricted his or her physical or mental ability to do basic work activities. *Id.* If the ALJ concludes that the impairment is not severe, the claim is denied. *Id.* If the ALJ makes a finding of severity, the ALJ proceeds to step three which requires a determination of whether the impairment meets or equals one of several listed impairments that the Commissioner acknowledges are so severe as to preclude substantial gainful activity. 20 CFR §§ 404.1520(d), 416.920(d); 20 CFR Pt. 404, Subpt. P, App.1. If the claimant's impairment meets or equals one of the listed impairments, then the claimant is presumed to be disabled and no further inquiry is necessary. If a decision cannot be made based on the claimant's then current work activity or on medical facts alone because the claimant's impairment does not meet or equal a listed impairment, then evaluation proceeds to the fourth step. At step four, ALJ considers whether the claimant has sufficient residual functional capacity

(hereinafter "RFC")[11] to perform past work.  20 CFR §§ 404.1520(e), 416.920(e).  If the ALJ concludes that the claimant has the RFC to perform past work, then the claim is denied.  *Id.* However, if the claimant cannot perform any past work due to a severe impairment, then the ALJ must move to the fifth step, which requires consideration of the claimant's RFC to perform other substantial gainful work in the national economy in view of claimant's age, education, and work experience.  20 CFR §§ 404.1520(f), 416.920(f).  When determining whether the claimant retains the ability to perform other work, the ALJ may refer to Medical Vocational Guidelines ("grids") promulgated by the SSA.  *Desrosiers v. Secretary,* 846 F.2d 573, 576-577 (9th Cir. 1988).  The grids are a valid basis for denying claims where they accurately describe the claimant's abilities and limitations.  *Heckler v. Campbell,* 461 U.S. 458, 462, n.5 (1983).  However, because the grids are based on exertional or strength factors, where the claimant has significant nonexertional limitations, the grids do not apply.  *Penny v. Sullivan,* 2 F.3d 953, 958-959 (9th Cir. 1993); *Reddick v. Chater,* 157 F.3d 715, 729 (9th Cir. 1998).  Where the grids do not apply,  the ALJ must use a vocational expert in making a determination at step five.  *Desrosiers,* 846 F.2d at 580.

2.     The ALJ's Decision

In her November 18, 2005 decision, the ALJ made the following findings:

1.     The claimant met the disability insured status requirements of the Act on March 1, 2001, the date the claimant stated he became unable to work, and continues to meet them through the date of this decision.

2.     The claimant has not engaged in substantial gainful activity since March 1, 2001.

3.     Since September 1, 2004, the medical evidence establishes that the claimant has these severe, medically determinable impairments: osteoarthritis of the cervical spine, bilateral carpal tunnel syndrome, residuals from surgery to remove a benign bladder tumor with a temporary colostomy, costochondritis, and vision problem in the left eye, but that he does not have an

---

[11]Residual functional capacity is defined as that which an individual can still do despite his or her limitations.  20 CFR § 404.1545, 20 CFR 416§945.

impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4. Prior to September 1, 2004, the claimant had no documented, severe medically determinable impairments of the requisite of 12 continuous months or more.

4.     Although the claimant has underlying medically determinable impairments that could reasonably cause the pain or other symptoms alleged, the evidence does not show that his symptoms were fully credible, and he is not precluded from engaging in substantial gainful activity.

5.     The claimant has the residual functional capacity as follows: for the period covering March 1, 2001 through August 31, 2004, the claimant had no documented, severe medically determinable impairments of the requisite of 12 continuous months or more. From September 1, 2004 through February 28, 2005, the claimant retained the residual functional capacity to perform light-level functioning on a sustained basis (as described in 20 CFR 404.1567(b)), can frequently stoop and has no documented postural or environmental limitations.  He needs to avoid wearing any heavy chest garments, and jerky motions of the head (i.e., using machinery (such as jackhammers) that would cause the body to jolt quickly).   In assessing the period beginning March 1, 2005 through the date of this decision, the Administrative Law Judge finds the claimant continues to retain the residual functional capacity for light-level functioning on a sustained basis with limitations as previously outlined for the period from September 1, 2004 through February 28, 2005, and he is further subject to a manipulative restriction which requires avoidance of repetitive use of the hands.  (20 CFR 404.1545)

6.     Since September 1, 2004, the claimant has been unable to perform his past relevant work as a construction mason and laborer, and janitor.

7.     Beginning September 1, 2004, the claimant's residual functional capacity for the full range of light work is reduced by the aforementioned limitations.

8.     The claimant is 48 years old, which is defined as a "younger individual." (20 CFR 404.1563)

9.     The claimant's educational level [sic] "limited or less – at least able to communicate in English."  Claimant completed eighth grade, but testified he has difficulty writing and can not [sic] do math.  (20 CFR 404.1564)

10.    The claimant does not have any acquired work skills which are transferable to the skilled or semiskilled work activities of other work.  (20 CFR 404.1568)

11.    Based on an exertional capacity for light work, and the claimant's age, education, and work experience, section 404.1569 and Rules 202.17, Table No. 2, Appendix 2, Subpart P, Regulations No. 4 would direct a conclusion of "not disabled."

12.    Although the claimant's additional nonexertional limitations do not allow him to perform the full range of light work, using the above-cited rules as a framework for decisionmaking, there are a significant number of jobs in the national economy which [sic] could perform.  Examples of such jobs for the period covering September 1, 2004 through February 28, 2005 are: Housekeeper (Dictionary of Occupational Titles (DOT) Job #323.687-014) with 912,000 jobs in the national economy, 20,130 jobs in the regional (Arizona) economy; Parking Lot Attendant (DOT Job #915.473-010) with 108,460 jobs in the national economy, 2,280 jobs in the regional economy (with 50 percent job base erosion allowing for money handling given claimant's mathematical skills); Assembler (Job #729.384-010) with 1.1 million jobs in the national economy, 19,170 jobs in the regional economy (with 50 percent job base erosion given the claimant's limited ability to write).  For the period covering March 1, 2005 through the date of this decision, examples of such jobs are: Parking Lot Attendant and Restaurant Host (DOT Job #310.137-010) with 295,170 jobs available in the national economy, 5, 520 jobs available in the regional economy (with 50 percent erosion of the job base to eliminate excess writing).

13.    The claimant was not under a "disability" as defined in the Social Security Act, at any time through the date of this decision (20 CFR 404.1520(c) and (g)).

### DECISION

It is the decision of the Administrative Law Judge that, based on the application filed effective February 6, 2004, the claimant is not entitled to  a period of disability or disability insurance benefits under sections 216(i) and 223, respectively, of the Social Security Act.

(TR. 21-23)

The ALJ also decided that Plaintiff's recurrent headaches and depression "are slight" and "have only minimal, if any, effect on his ability to work and are therefore 'non-severe.'" (TR. 15)

In reaching her decision, the ALJ accorded substantial weight to the testimony of Dr. Belzer.  (TR. 18) She gave less weight to the opinion of treating Dr. Gonzalez because his recommended work limitations were too restrictive based on the objective medical evidence.

- 20 -

(Id.)  The ALJ also gave "less weight" to the opinion of the state agency analyst and medical reviewer that Plaintiff was able to perform light work because that opinion conflicted with Dr. Belzer's opinion and was not supported by the totality of the evidence.  (Id.)

Additionally, the ALJ accorded "very little weight to" Plaintiff's subjective complaints and, therefore, determined that Plaintiff's impairments were not as limiting as he alleged.  (TR. 19)

III.    CROSS-MOTIONS FOR SUMMARY JUDGMENT

A.    Argument

Plaintiff argues that the ALJ erred in her determination at step two that Plaintiff's mental impairment was not severe and such error rendered the ALJ's later RFC assessment and step five determination incorrect.  Plaintiff also argues that the ALJ erred by failing to consider the impact of his illiteracy on his ability to perform other work.  Plaintiff also points out that the ALJ's failure to consider lay witness testimony was erroneous.

Defendant asserts that Nurse McVay's mental assessment, which was not before the ALJ or Appeals Council, does not merit remand because Plaintiff did not meet the requisite showing of good cause and materiality to allow its consideration.  Defendant also asserts that the ALJ did not err at step two or later when addressing Plaintiff's illiteracy.  Nor does the ALJ's failure to discuss lay witness testimony constitute error.   Alternatively,  even if the ALJ's failure to discuss the lay witness testimony constituted error, such error was harmless.

B.    Standard of Review

An individual is entitled to Title XVI Supplemental Security Income disability benefits (hereinafter "SSI") if the individual meets certain eligibility requirements and demonstrates the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. §§ 1381(a), 1382c(a)(3)(A).  "'A claimant will be found disabled only if the impairment is so severe that, considering age, education, and work experience,

- 21 -

that person cannot engage in any other kind of substantial gainful work which exists in the national economy.'" *Penny,* 2 F.3d at 956 (*quoting Marcia v. Sullivan,* 900 F.2d 172, 174 (9th Cir. 1990)).

To establish a *prima facie* case of disability, the claimant must demonstrate an inability to perform his or her former work. *Gallant v. Heckler*, 753 F.2d 1450, 1452 (9th Cir. 1984). Once the claimant meets that burden, the Commissioner must come forward with substantial evidence establishing that the claimant is not disabled. *Fife v. Heckler*, 767 F.2d 1427, 1429 (9th Cir. 1985).

The findings of the Commissioner are conclusive and courts may overturn the decision to deny benefits "only if it is not supported by substantial evidence or it is based on legal error." *Matney v. Sullivan,* 981 F.2d 1016, 1019 (9th Cir. 1992)(citations omitted). Therefore, the Commissioner's determination that a claimant is not disabled must be upheld if the Commissioner applied the proper legal standards and if the record as a whole contains substantial evidence to support the decision. *Clem v. Sullivan*, 894 F.2d 328, 330 (9th Cir. 1990) (citing *Desrosiers*, 846 F.2d at 575-76; *Delgado v. Heckler*, 722 F.2d 570, 572 (9th Cir. 1983)). Substantial evidence is defined as such relevant evidence which a reasonable mind might accept as adequate to support a conclusion. *Jamerson v. Chater,* 112 F.3d 1064, 1067-68 (9th Cir. 1997); *Winans v. Bowen,* 853 F.2d 643, 644 (9th Cir. 1988). However, substantial evidence is less than a preponderance. *Matney,* 981 F.2d at 1019.

The Commissioner, not the court, is charged with the duty to weigh the evidence, resolve material conflicts in the evidence and determine the case accordingly. *Id.* However, when applying the substantial evidence standard, the court should not mechanically accept the Commissioner's findings but should review the record critically and thoroughly. *Day v. Weinberger*, 522 F.2d 1154 (9th Cir. 1975). Reviewing courts must consider the evidence that supports as well as detracts from the examiner's conclusion. *Id.* at 1156.

In evaluating evidence to determine whether a claimant is disabled, the opinions of treating physicians are entitled to great weight. *Magallanes v. Bowen,* 881 F.2d 747, 751 (9th

Cir. 1989). However, even a treating physician's opinion is not necessarily conclusive on either the issue of a physical condition or the ultimate issue of disability. *Id.* When resolving a conflict between the opinion of a treating physician and that of an examining or non-examining physician, the opinion of the treating physician is entitled to greater weight and may be rejected only on the basis of findings setting forth specific legitimate reasons based on substantial evidence of record. *Id.* Moreover, the Commissioner may reject the treating physician's uncontradicted opinion as long as the Commissioner sets forth clear and convincing reasons for doing so. *Id.*

Further, when medical reports are inconclusive, questions of credibility and resolution of conflicts in the testimony are functions solely of the Commissioner. *Id.* (citations omitted). However, the Commissioner's finding that a claimant is less than credible must have some support in the record. *See Light v. Social Security Administration,* 119 F.3d 789 (9th Cir. 1997); *Connett v. Barnhart,* 340 F.3d 871 (9th Cir. 2003).

C.   DISCUSSION

1.   New Evidence

The Court has jurisdiction to remand matters to the Commissioner for consideration of newly discovered evidence. 42 U.S.C. § 405(g). Defendant argues that the Court should not remand this matter to the Commissioner for consideration of Nurse McVay's May 4, 2006 mental assessment.

The November 18, 2005 "Notice of Decision – Unfavorable" contained information concerning how to appeal the ALJ's decision including the direction that "any new evidence" should be submitted to the Appeals Council with Plaintiff's request for review. (TR. 11) The Appeals Council received additional evidence consisting of a memorandum from Plaintiff's counsel dated January 13, 2006. (TR. 9) On March 7, 2006, the Appeals Council entered its Notice of denial of Plaintiff's request for review of the ALJ's decision. (TR. 6-8)  On May 4, 2006, Plaintiff filed the instant court action.  Thereafter, on May 16, 2006, Plaintiff submitted to the Appeals Council Nurse McVay's May 4, 2006 mental assessment indicating

that the document was "important as additional evidence for either review by the Federal District Court or Remand."  (TR. 5-A) It is undisputed that Nurse McVay's May 4, 2006 mental assessment was not presented while Plaintiff's case was pending before either the ALJ or the Appeals Council.  (Defendant's XMSJ, p. 3; Plaintiff's Response, p.3) Thus, Nurse McVay's mental assessment, which was submitted after initiation of the instant action, is new evidence.

The Court may remand a case to the Commissioner for consideration of new evidence when the plaintiff demonstrates that there is: (1) new evidence that is material; and (2) good cause exists for his failure to incorporate that evidence into the administrative record. *Sanchez v. Secretary,* 812 F.2d 509, 511 (9th Cir. 1987) (*citing Allen v. Secretary,* 726 F.2d 1470, 1472 (9th Cir. 1984)); 42 U.S.C. § 405(g)).

Plaintiff alleged mental problems at the time of the hearing before the ALJ.  Plaintiff provides no explanation why he did not obtain the mental assessment earlier.

With regard to the good cause requirement, "[i]f new information surfaces after the [Commissioner's] final decision and the claimant could not have obtained that evidence at the time of the administrative proceeding, the good cause requirement is satisfied."  *Key v. Heckler,* 754 F.2d 1545, 1552 (9th Cir. 1985).  However, "[a] claimant does not meet the good cause requirement simply by obtaining a more favorable report from an expert witness once his claim is denied...The claimant must establish good cause for not seeking the expert's opinion prior to the denial of his claim."  *Clem,* 894 F.2d at 332 (*citing  Key,* 754 F.2d at 1551). The Ninth Circuit has not found good cause and, thus, has declined to remand cases for consideration of new evidence where, like here, the plaintiff offered no reason why he could not have obtained the evidence earlier.  *Id.* at 332-333 (*citing Key,* 754, F.2d at 1551; *Allen,* 726 F.2d at 1473).  Specifically, in *Key,* the Ninth Circuit opined that "the obvious explanation is that when Key failed to succeed on his disability claim...he sought out a new expert witness who might better support his position.  The 'good cause' requirement would 'be meaningless if such circumstances were sufficient to allow introduction of new

evidence.'" *Key,* 754 F.2d at 1551 (*quoting Allen,* 726 F.2d at 1473); *see also Clem,* 894 F.2d at 332-333 (no good cause to remand in case that was "analogous to the one analyzed by us in *Key*..."). Because Plaintiff herein offers no explanation why the evidence could not have been obtained earlier for use by the Commissioner, Plaintiff failed to meet the good cause requirement. *Id.* Consequently, remand for consideration of Nurse McVay's report is not appropriate in this case.

### 2.     Plaintiff's Mental Impairment

Plaintiff argues that the ALJ erred when she determined that Plaintiff's mental impairment was not severe. At step two, the ALJ determined that Plaintiff's "recurrent headaches and depression are slight which have only minimal, if any, effect on his ability to work and are therefore 'non-severe.'" (TR. 15)  Thus, the ALJ did not consider Plaintiff's depression in the remainder of the five-step disability analysis, including Plaintiff's RFC determination and hypothetical questions posed to the vocational expert.

Once a claimant has demonstrated that he is not engaged in substantial gainful activity, the ALJ must proceed to step two to determine whether the claimant has a medically severe impairment or combination of impairments significantly limiting him from performing basic work activities.  20 CFR § 404.1520(c).  Under the regulations, "an impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities."  20 CFR § 404.1521(a). *See also Bowen v. Yuckett,* 482 U.S. 137 (1987) (at step two, the Commissioner makes an initial determination of medical severity without consideration of the claimant's age, education, and experience); SSR 96-3p (an impairment is "not severe" when medical evidence establishes only "a slight abnormality (or a combination of slight abnormalities) that has no more than a minimal effect on the ability to do basic work activities.") Basic work activities are "the abilities and aptitudes necessary to do most jobs" such as walking, standing sitting and other physical functions, understanding, carrying out and remembering simple instructions; use of

judgment; responding appropriately to supervisors, co-workers and usual work situations; and dealing with changes in a routine work setting.  20 CFR. § 404.1521(c).

The step-two inquiry is a *de minimus* screening device to dispose of groundless claims.  *Smolen v. Chater,* 80 F.3d 1273, 1290 (9th Cir. 1996).  "The regulations guiding the step-two determination of whether a disability is severe is merely a threshold determination of whether the claimant is able to perform his past work.  Thus, a finding that a claimant is severe at step two only raises a prima facie case of a disability."  *Hoopai v. Astrue,* 499 F.3d 1071, 1075 (9th Cir. 2007).

> When determining that Plaintiff's mental impairment was not severe, the ALJ stated:
>
> There is very little evidence pertaining to headaches and no indication that headaches limit the claimant's functioning.  Neither does the claimant's depression limit his ability to perform work-related activities.  The claimant said he was depressed since he had surgery and wanted counseling but no medication.  He was diagnosed with mood disorder due to chronic back pain with depressed features and assigned a Global assessment of Functioning score of 60 indicating mild to moderate symptoms (Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text revised).  He was prescribed Lexapro and then Prozac.  His treating physician noted the claimant did well on the medication....The medical evidence shows the claimant has only mild symptoms.  The state agency analyst and medical reviewer found the claimant's mental impairment to be non-severe and the Administrative Law Judge gives it weight because it is consistent with the medical evidence as a whole.

(TR. 15)

Plaintiff argues that Dr. Gonzalez' and FNP-C Sealey's concern about Plaintiff's cognitive functioning and score of 21/30 on a mini-mental status examination caused them to order a brain MRI and refer Plaintiff to Dr. Valdivia for a dementia assessment.  Plaintiff points out that these records post-dated non-examining Dr. Tangeman's opinion to which the ALJ accorded weight.  Plaintiff also states that the lay witness testimony, which the ALJ did not address, supports the conclusion that Plaintiff's mental impairment was severe under the regulations.[12]

---

[12]Plaintiff also relies on Nurse McVay's May 2006 mental assessment which, based on the discussion *supra,* at pp. 23-25, does not factor into the instant analysis.

- 26 -

Defendant asserts that a June 2004 assessment[13] showed intact memory and average cognition.  (Defendant's XMSJ, pp. 2-3 (*citing* TR. 299)) Defendant also argues that the substantial evidence of record demonstrates that Plaintiff did not prove he had a severe mental impairment that more than minimally affected his ability to perform work activities.

Under the regulations, a claimant's mental impairment is evaluated by use of a Psychiatric Review Technique. 20 CFR § 404.1520a. "In evaluating the severity of mental impairments, the technique provides for rating the degree of functional limitation in each of four functional areas: activities of daily living, social functioning; concentration, persistence, or pace; and episodes of decompensation." *Bronson v. Astrue,* __ F.Supp.2d __, 2008 WL 110890 (D. Kan. 2008) (*citing* 20 CFR § 404.1520a(c)).  The severity of the claimant's condition is determined after the degree of limitation is rated in each functional area. *Id.* (*citing* 20 CFR § 404.1520a(d)).  Where, as in the instant case, "the first three functional areas are rated as... 'mild,' and the fourth area is rated as 'none', the agency will conclude at step two of the sequential evaluation process that plaintiff's mental impairments are not severe 'unless the evidence otherwise indicates that there is more than a minimal limitation in [plaintiff's] ability to do basic work activities.'" *Id.* (*quoting* 20 CFR § 404.1520a(d)(1)) (upholding ALJ's finding of non-severe mental impairment, where *inter alia,* the plaintiff had a GAF score of 60).

Plaintiff's argument centers on FNP-C Sealey's September 2004 referral of Plaintiff for an MRI and to a neurologist after Plaintiff scored 21 out of 30 on the "[m]ini mental status exam...However, he did only finish the sixth grade."[14]  (TR. 366) The examination to

_____

[13]Defendant indicates the assessment is from "St. Mary's Hospital" instead of SAMHC (Southern Arizona Mental Health Corporation), this misnomer is has no bearing on Defendant's argument.  (Defendant's XMSJ, p.2 (*citing*; TR. 299))

[14]Although FNP-C Sealey and Plaintiff (in his MSJ at p.9) indicated that the highest grade Plaintiff completed was the sixth grade, Plaintiff's testimony, Disability Report, and Statement of Facts filed in support of his MSJ reflect that the highest grade he completed was eighth grade.  (TR. 88, 400; PSOF, p.2)

which FNP-C Sealey refers "consists of eleven questions that are used to assess such cognitive functions as orientation, learning and memory, attention, calculations, comprehension, reading, writing, and drawing." Richard F. Spiegle, Spencer J. Cron, Legal Guidelines and Methods for Evaluating Capacity, in *Colorado Lawyer*, 32 Jun.Colo.Law. 65, 68 (June 2003). Plaintiff is correct that, generally, scores 22 and below are likely indicators of cognitive impairment. *Id.*; (Plaintiff's Reply, p.3) However, in this case, the record supports the conclusion that Plaintiff's treating sources' concern about dementia/cognitive impairment was allayed. Upon the initial test result, FNP-C Sealey's note indicated her recognition that Plaintiff's educational background may account for such a low score. Like FNP-C Sealey, the ALJ was aware of Plaintiff's limited education, difficulty writing and inability to do math. (TR. 22). However, the step-two medical severity evaluation does not include consideration of the claimant's education. *See Yuckett,* 482 U.S. 137. Additionally, the MRI prompted by Plaintiff's test score and complaints was normal. (TR. 364) Further, although Plaintiff was referred to Dr. Valdivia for "a possible dementia work up," Dr. Gonzalez subsequently noted that Dr. Valdivia felt that Plaintiff was "more depressed than anything else." (TR. 359) When Dr. Gonzalez spoke to Plaintiff about this, Plaintiff admitted he was depressed and Dr. Gonzalez, as noted by the ALJ, prescribed medication for depression. (Id.) By February 21, 2005, Plaintiff's diagnosis was depression. (TR. 354) FNP-C Sealey noted that Plaintiff had been "doing better on Lexapro but had to get on generic Prozac due to insurance coverage. He is doing fair on the 20 mg dose but admits he felt a lot better when he was on the Lexapro." (Id.) She increased Plaintiff's dosage of Prozac. (Id.)

It is well-settled that while ALJs must make fairly detailed findings in support of their decisions to permit courts to review those decisions intelligently, ALJs "need not discuss *all* evidence presented" to them. *Vincent v. Heckler,* 739 F.2d 1393, 1395 (9th Cir. 1984) (emphasis in original). "Rather, [ALJs] must explain why 'significant probative evidence has been rejected.'" *Id.* (quoting *Cotter v. Harris,* 642 F.2d 700, 706 (3d Cir. 1981)). The

treatment notes reflecting suspicion of dementia were neither significant nor probative on this record. The record reflects that although Dr. Gonzalez and FNP-C Sealey initially suspected dementia, the subsequent MRI, referral to Dr. Valdivia, and Plaintiff's own statements to Dr. Gonzalez resulted in the diagnosis of depression and course of treatment for same. (*See* TR. 354, 366) Such diagnosis was consistent with Dr. Tangeman's August 2004 finding to which the ALJ accorded weight. Consequently, the ALJ's failure to refer to the statements from FNP-C Sealey and Dr. Gonzalez cited by Plaintiff was not erroneous.

Plaintiff also argues that the ALJ's determination at step two was erroneous because she failed to consider statements from Plaintiff's sister concerning mental functioning. (Plaintiff's MSJ, pp. 7-8) Plaintiff's sister indicated that Plaintiff was unable to follow directions or instructions, needed to be reminded of doctors' appointments and to take medication, became confused when counting money, had problems concentrating and understanding, and could not handle stress or adapt well to changes. (TR. 172-178) She also indicated that he did not go out very often because of depression and he had withdrawn from social activities and family functions "[b]ecause of the pain and depression...." (TR. 175, 177)

Defendant argues that Plaintiff did not cite any lay witness testimony that would be relevant. Defendant also contends that the ALJ need not address all evidence of record. Defendant further asserts that any error in failing to discuss the lay statements is harmless.

Contrary to Defendant's argument, Plaintiff cited specific testimony from his sister to support his position. (*See* Plaintiff's MSJ, pp. 7-8) While generally, lay testimony making a medical diagnosis or vocational assessment is "beyond the competence of lay witnesses and therefore do[es] not constitute competent evidence" requiring consideration by the ALJ, "[l]ay testimony as to a claimant's *symptoms* is competent evidence which the [ALJ] must take into account...unless he expressly determines to disregard such testimony, in which case 'he must give reasons that are germane to each witness.'" *Nguyen v. Chater,* 100 F.3d 1462, 1467 (9th Cir. 1996) (*citing Vincent,* 739 F.2d at 1395 and (*quoting Dodrill v. Shalala,*

12 F.3d 915, 919 (1993)) (emphasis in original).   Moreover, the Ninth Circuit has "never found harmless an 'ALJ's silent disregard of lay testimony about how an impairment limits a claimant's ability to work.'"   *Robbins v. Soc. Sec. Admin.,* 466 F.3d 880, 885 (9th Cir. 2006) (*quoting Stout v. Comm'r,* 454 F.3d 1050, 1055-1056 (9th Cir. 2006)).

The ALJ was required to consider subjective symptom testimony, in addition to medical evidence, when assessing the severity of Plaintiff's mental impairment. *See* 20 CFR § 404.1529(d)(1) ("symptoms, such as pain, fatigue, shortness of breath, weakness, or nervousness are considered in making a determination as to whether your impairment or combination of impairment(s) is severe.")  The statement from Plaintiff's sister included information about Plaintiff's symptoms which the ALJ did not address as required.  Nor was the error harmless.  Plaintiff's sister corroborated Plaintiff's symptom testimony.  Fully crediting the statement from Plaintiff's sister provides substantial support for Plaintiff's description of his symptoms.  *See Stout,* 454 F.3d at 1056 ("[A] reviewing court cannot consider the error harmless unless it can confidently conclude that no reasonable ALJ, when fully crediting the testimony, could have reached a different disability determination.") Had the ALJ determined at step two that Plaintiff's mental impairment was severe, then such impairment would have necessarily factored into the ALJ's evaluation at steps three through five. *Schoofield v. Barnhart,* 220 F.Supp.2d 512 (D. Md. 2002) ("Erroneous findings at [s]tep [t]wo usually infect the entire decision, since all of a claimant's impairments must be considered in combination at..." steps three, four and five).  Given the *de minimus* showing required at step two, it cannot be said on this record that the ALJ's failure to consider testimony from Plaintiff's sister was harmless.  *Id.; Robbins,* 466 F.3d at 885.

### 3.    Lay Statements

The ALJ's failure to consider lay statements impacts Plaintiff's case beyond the ALJ's step-two determination.  Plaintiff argues that the ALJ's failure to consider the lay testimony also erroneously affected the ALJ's rejection of Plaintiff's credibility and the ALJ's ultimate RFC determination.  Plaintiff is correct that when determining a claimant's RFC, the "ALJ

must consider all relevant evidence in the record including, *inter alia,* medical records, *lay evidence*, and 'the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment.'" *Robbins,* 466 F.3d at 883 (*quoting* SSR 96-8p) (emphasis added). Consequently, the ALJ's RFC determination takes into account Plaintiff's credibility as well as third party statements. Moreover, assessment of Plaintiff's credibility may also include observations from third parties. *Smolen,* 80 F.3d at 1284; *see also Robbins,* 466 F.3d at 884 ("To find the claimant not credible, the ALJ must rely either on reasons unrelated to the subjective testimony (e.g., reputation for dishonesty), on conflicts between his testimony and his own conduct; or on internal contradictions in that testimony.")

The statements from Plaintiff's brother and sister indicated that Plaintiff's impairments  affected his ability to lift, squat, and bend.  (TR. 168, 177 )  Additionally, Plaintiff's sister stated that Plaintiff used a chair to shower and his impairments affected his ability to stand, reach, walk, sit, kneel, talk, remember, see, climb stairs, use hands, follow instructions, understand, and concentrate.  (TR. 173, 177; *see also supra,* at pp. 29-30 (discussing other statements from Plaintiff's sister regarding Plaintiff's mental functioning)) Plaintiff's brother indicated that Plaintiff did not respond well to spoken instructions: "take [sic] two time [sic] to get right."  (TR. 168)  Plaintiff's brother also stated that Plaintiff could not read and write well.  (TR. 166) Plaintiff's sister stated he was illiterate.  (TR. 179)

As discussed above, "'[l]ay testimony as to a claimant's symptoms is competent evidence that an ALJ must take into account, unless he or she expressly determines to disregard such testimony and gives reasons germane to each witness for doing so.'" *Robbins,* 466 F.3d at 885 (*quoting Lewis v. Apfel,* 236 F.3d 503, 511 (9th Cir. 2001) and concluding that the ALJ's silent disregard of competent lay testimony was not harmless error).  Besides Plaintiff's own symptom testimony, the ALJ had only that of Plaintiff's brother and sister to consider.  Further, Plaintiff's siblings offered the only corroboration of Plaintiff's symptom testimony.  Fully crediting the lay statements provides support for Plaintiff's description of the severity and limiting effects of his symptoms as well as for each sibling's individual

statement of same.  The ALJ's RFC assessment did not take into account the majority of the postural, positional,  and mental, i.e. exertional and non-exertional, limitations which were the subject of Plaintiff's testimony and his siblings' statements.  By failing to properly account for the lay statements, "the ALJ erred in assessing the record testimony offered in support of" Plaintiff's disability claim.  *Id.* at 885.  Consideration of the lay statements may well affect the ALJ's credibility and RFC determinations herein and, in turn, the existence of available jobs in the national economy for a person in Plaintiff's physical and mental condition–an issue for which the Commissioner bears the burden.  Therefore, under the instant circumstances, it cannot be said with respect to statements from Plaintiff's siblings that "'no reasonable ALJ, when fully crediting the testimony could have reached a different disability determination.'"  *Id.* (*quoting Stout,* 454 F.3d at 1055-1056).

> 4.     Illiteracy

Plaintiff argues that the ALJ should have found that he was illiterate and failure to make such a finding constitutes error.

In her decision, the ALJ stated that:

> The claimant testified that he can read English, but he does not write more than his name and address.  He said he cannot do math, but went to regular classes in school and teachers passed him.
> ***
> Claimant completed eighth grade, but testified he has difficulty writing and can not [sic] do math.

(TR. 18, 19) The ALJ found:

> The claimant's educational level 'limited or less–at least able to communicate in English.' Claimant competed eighth grade, but testified he has difficulty writing and can not [sic] do math (20 CFR 404.1564).

(TR. 22)  The ALJ also declined to consider jobs that required "some writing" and accepted the vocational expert's decision to reduce the number of available positions given Plaintiff's "limited ability to write" and/or to eliminate jobs requiring "excess writing."  (TR. 428-433; TR. 22)

- 32 -

The regulations define illiteracy as "the inability to read or write. We consider someone illiterate if the person cannot read or write a simple message such as instructions or inventory lists even though the person can sign his or her name. Generally, an illiterate person has had little or no formal schooling." 20 CFR § 404.1564(b)(1). The Commissioner bears the burden of establishing that a claimant is literate. *Silveira v. Apfel,* 204 F.3d 1257, 1262 & n.14 (9th Cir. 2000).

Plaintiff testified that he could write only his name and address. (TR. 401-402) He was unable to write a shopping list, instructions or a sentence. (TR. 401) His previous work did not require him to write. (TR. 402)   He completed the disability forms with assistance from his sister who told him "the letters" to write. (TR. 403)   Plaintiff also testified that he could read beyond a few paragraphs. (TR. 401) He stated that he could read at a sixth-grade level. (TR. 81) Plaintiff's siblings submitted statements concerning Plaintiff's difficulty with reading and writing which the ALJ did not discuss.

Plaintiff's literacy or lack thereof is relevant to the ALJ's application of the grid in this case. Rule 202.17, Table No. 2, Appendix 2,Subpart P, Regulations No.4, applied by the ALJ, directs a conclusion of "not disabled" for claimants, who among other things, have a limited or less education and are "at least literate and able to communicate in English." The ALJ's use of Rule 202.17 implies the ALJ's finding that Plaintiff is in fact literate. Yet, Plaintiff's testimony that he cannot write more than his name and address supports the conclusion that he is illiterate under the regulation. *See* 20 CFR § 404.1564(b)(1).  However, Defendant is correct  that even if that were the case, Rule 202.16,[15] which  would instead apply, nonetheless directs a finding of "not disabled." (Defendant's XMSJ, p. 4)  The record

---

[15]Rule 202.16, Table No. 2, Appendix 2, Subpart P, Regulations No. 4 is identical to Rule 202.17 applied herein, except that Rule 202.16 applies to claimants who are illiterate or unable to communicate in English. *See Chavez v. Department of Health & Human Servs.,* 103 F.3d 849 (9th Cir. 1996) ("or" as used in the grid is conjunctive); *Silveira,* 204 F.3d at 1261-1262 (same)).

also reflects that the vocational expert and the ALJ omitted consideration of some jobs and reduced the number of available positions with regard to other jobs in light of what the ALJ characterized as Plaintiff's "limited ability to write."  (TR. 22)

As discussed above, the ALJ erroneously omitted lay testimony concerning, among other things, Plaintiff's ability to read or write. Other than the fact that Plaintiff was passed in school through the eighth grade, there is little, if any, support in the record for the ALJ's the conclusion that Plaintiff has a "limited ability to write" instead of the conclusion that he is unable to "write a simple message" as discussed in the regulation. 20 CFR § 404.1564(b)(1); *see also Silveira,* 204 F.3d 1257 (remanding where there was insufficient evidence in the record to determine that the plaintiff was literate in English).  An express finding of illiteracy, rather than a finding of a "limited ability to write" may erode the identified job base further.  Moreover, if consideration of lay statements affects the RFC and credibility determinations so as to  restrict Plaintiff to sedentary work, then a finding that Plaintiff is illiterate could render him disabled under the grids.  *See* Rule 201.17, Table No. 1, Appendix 2, Subpart P, Regulations No. 4.  (Where maximum sustained work capacity is limited to sedentary work, a younger individual who is "[i]lliterate...", with a previous work experience of unskilled work is disabled).   Consequently, the Commissioner's failure to carry his burden regarding the finding that Plaintiff is literate is not harmless.  *Silveira,* 204 F.3d at 1257; *Stout,* 454 F.3d at 1055-1056.

## IV.    CONCLUSION

Plaintiff requests that the Court remand the matter for an immediate award of benefits or, in the alternative, remand for further proceedings including consideration of Nurse McVay's mental assessment and the lay statements.  As discussed above, remand is not warranted for consideration of Nurse McVay's mental assessment.  As to the lay statements, remand for an award of benefits is appropriate where:

> (1) the ALJ failed to provide legally sufficient reasons for rejecting the evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and (3) it is clear from the record that

- 34 -

> the ALJ would be required to find the claimant disabled were such evidence credited.

*Benecke v. Barnhart*, 379 F.3d 587, 593 (9th Cir. 2004) (citations omitted).  Where the test is met, "we will not remand solely to allow the ALJ to make specific findings...Rather we take the relevant testimony to be established as true and remand for an award of benefits." *Id*. (citations omitted); *see also Lester v. Chater,* 81 F.3d 821, 834 (9th Cir. 1995).

As discussed above, the ALJ's failure to properly consider the lay statements may affect the ALJ's assessment of the severity of Plaintiff's alleged mental impairment at step two, as well as the ALJ's credibility and RFC determinations and the existence of other work in the national economy that Plaintiff can perform.  Additionally, the ALJ should reassess Plaintiff's claim of illiteracy in light of the applicable regulation and evidence of record, including the lay statements, which, in turn, may also affect the ALJ's credibility and RFC determinations. *See e.g.*, *Silveira,* 204 F.3d 1257 (remanding for further proceedings where the ALJ made no express finding that the plaintiff was literate in English and there was insufficient evidence in the record to determine same); *Bunnell v. Barnhart*, 336 F.3d 1112, 1115-1116 (9th Cir. 2003) (remanding where outstanding issues, including ALJ's reassessment of plaintiff's credibility, must be resolved before a disability determination can be made).  Reassessment of the RFC determination may or may not require additional testimony from a vocational expert and may or may not affect whether the Commissioner has met his burden of showing the existence of other work in significant numbers that Plaintiff can perform.  Because outstanding issues must be resolved before a determination of disability can be made, remand for an award of benefits is not warranted.  The matter should be remanded for further proceedings including additional testimony if necessary.

## V.     RECOMMENDATION

For the foregoing reasons,  the Magistrate Judge recommends  that the District Court:

(1)      grant in part and deny in part Plaintiff's Motion for Summary Judgment (Doc. No. 14)   The Motion should be granted to the extent that Plaintiff seeks

remand for further proceedings.  The Motion should be denied to the extent Plaintiff seeks remand for an immediate payment of benefits;

(2)     deny Defendant's Cross-Motion for Summary Judgment (Doc. No. 17);

(3)     remand this matter for further proceedings consistent with this Report and Recommendation.

Pursuant to 28 U.S.C. §636(b), any party may serve and file written objections within ten days after being served with a copy of this Report and Recommendation. If objections are filed, the parties should use the following case number:  CV 06-221-TUC-FRZ.  A party may respond to another party's objections within ten days after being served with a copy thereof.  *See* Fed.R.Civ.P. 72(b).

If objections are not timely filed, then the parties' right to *de novo* review by the District Court may be deemed waived.  *See United States v. Reyna-Tapia,* 328 F.3d 1114, 1121 (9th Cir.) (*en banc*), *cert. denied,* 540 U.S. 900 (2003).

DATED this 22nd day of February, 2008.

_____

Héctor C. Estrada
United States Magistrate Judge